**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>**RAYVON LAMAR HARRIS,**<br><br>  **Defendant.** | **Case No. 25-cr-349 (SLS) (GMH)** |
| **IN THE MATTER OF THE SEARCH OF A BLACK CELLPHONE CURRENTLY STORED AT THE METROPOLITAN POLICE DEPARTMENT'S EVIDENCE CONTROL BRANCH IN WASHINGTON D.C. UNDER RULE 41** | **Case No. 25-sw-330 (GMH)** |

## <u>MEMORANDUM OPINION AND ORDER</u>

Anyone who has hesitated before handing their unlocked phone over to another person already understands a basic truth: few things contain more of the intimate details of our lives than a smartphone. A request to look through someone else's phone is likely to meet a response befitting a request to accompany them into the examination room or confessional. So closely guarded are the contents of modern smartphones that most now come equipped with biometric security measures once associated with spy novels. Yet the very thing that makes smartphones so private—the vast amount of information they contain about our lives—also makes them fertile ground for criminal investigators. In the digital age, smartphones are where the evidence lives.

For that reason, the target of choice for law enforcement searches has shifted to cellphones. Having reviewed thousands of search warrants applications over the past decade, the Court has witnessed that move from the physical to the digital world. While search warrants for homes have not totally gone the way of the landline, they are no longer the primary means by which

investigators look for the evidence that matters most.  Today, police are much more likely to seek that evidence on a smartphone than in a filing cabinet, dresser drawer, or basement box.  And no doubt—and, in truth, thankfully—many crimes have been solved based on evidence found on cellphones.

As technology and investigative techniques have evolved, so too have the grounds invoked by the government to support its search warrant applications.  Because smartphones capture information about nearly every aspect of our lives, it is increasingly rare that law enforcement cannot advance some argument for why a suspect's phone should be searched.  That is unsurprising.  The more our lives are stored on our phones, the easier it becomes to claim that evidence of crime may also be found there.  The prospect, of course, is a society in which nearly every criminal suspect's phone will be subject to search—a result that, however useful to law enforcement, is difficult to reconcile with the privacy interests the Fourth Amendment was designed to protect.

The government's application in this case brings that concern into sharp focus.  Defendant is charged with being a felon in possession of a firearm.  The government seeks a warrant to search his cellphone for evidence of that offense.  In support of its application, the government offers no particularized facts—either as to Defendant, his cellphone, or the actual circumstances of the crime he allegedly committed—demonstrating a fair probability that evidence of that crime will be located on Defendant's cellphone.  Instead, it relies only on the generalized experience of law enforcement that evidence of illegal firearm possession is often found on the phones of felon-in-possession suspects.  The affiant makes that representation in boilerplate language that could be used in any felon-in-possession case—or, with little effort, adapted to nearly any other criminal case—precisely because smartphones store the details of nearly every aspect of their owners' lives, including, often, the government says, evidence of criminal conduct.

Because that falls short of establishing probable cause to search *Defendant's* phone *in this case*, the Court will deny the government's application for a warrant. And since the government asserts no other basis for its continued retention of Defendant's phone, the Court will grant Defendant's motion for the return of his phone under Federal Rule of Criminal Procedure 41(g).[1]

## I.    BACKGROUND

The following factual background is drawn from the allegations in the government's amended affidavit in support of its application for a warrant to search Defendant's smartphone, an excerpt of which is attached as an appendix to this opinion.

At around 9:30 PM on October 14, 2025, law enforcement officers approached a car parked in a no parking zone on the 1000 block of 5th Street NW. App'x, ¶ 7. When an officer asked the driver to lower the window, the driver mistakenly lowered the rear driver's side window, allowing the officer to see "individuals inside the vehicle rummaging around." *Id.*, ¶ 8. Officers then ordered all occupants out of the car, including Defendant Rayvon Harris, who was seated in the rear driver's side seat. *Id.*, ¶¶ 8–9. Officers observed a glass jar labeled "THC" containing a "yellowish-brownish residue" officers believed to be THC or hashish, a controlled substance, in the pocket on the rear of the driver's seat, directly in front of Defendant. *Id.*, ¶¶ 9–10. Defendant was placed under arrest for possession of the THC, and in the course of a search of his person a handgun was found in his waistband. *Id.*, ¶ 10. When confirming Defendant's identity, officers learned that Defendant was previously convicted of crime punishable by a term of imprisonment exceeding

---

[1] The relevant docket entries for the purposes of this Memorandum Opinion are: (1) Defendant's motion for the return of property under Federal Rule of Criminal Procedure 41(g), ECF No. 10; (2) Defendant's supplemental brief in support of his Rule 41(g) motion, ECF No. 25; (3) the Federal Public Defender's brief as *amicus curiae* in support of Defendant's Rule 41(g) motion, ECF No. 26; (4) the government's response to Defendant's supplemental brief, ECF No. 32; (5) Defendant's reply in support of his Rule 41(g) motion, ECF No. 37; and (6) the Federal Public Defender's reply as *amicus curiae* in support of Defendant's Rule 41(g) motion, ECF No. 38. This Memorandum Opinion also considers the government's amended application for a warrant to search Defendant's cellphone and the affidavit in support thereof, relevant portions of which were provided to Defendant and the Federal Public Defender and are included as an appendix to this opinion.

one year.  *Id.*, ¶¶ 11–12.  Officers also recovered a black smartphone from a cupholder in the armrest next to Defendant and between the rear seats in the car, which they believe belonged to Defendant.  *Id.*, ¶ 14.  Defendant now concedes that the phone is his, so the identity of its owner is not at issue.  *See* ECF No. 10.[2]

After Defendant's arrest, the government applied for a warrant to search his smartphone. In support of that application, the government filed an affidavit from a law enforcement officer. The government later submitted an amended affidavit in support of its warrant application.  After providing the factual allegations summarized above, the Warrant Affidavit seeks authority to search the smartphone by describing their "pervasiveness" in our society, including that "virtually all adults and older teens in the United States use mobile digital devices" and that a person's smartphone "contains a digital record of [that] individual's life."  App'x, ¶¶ 18–22.  It then explains that "in the significant majority of cases where law enforcement is able to access a suspect's device in the context of the investigation of the [felon-in-possession offenses], that suspect's device contains evidence relevant to the [felon-in-possession offense]."  *Id.*, ¶ 25.  And it alleges based on officers' "training and experience" that individuals who allegedly possess firearms as felons often store on their phones "images or videos of what appears to be the specific subject firearm(s)," "communications regarding firearm possession and trafficking," and "records of financial transactions" in illegal firearms.  *Id.*, ¶¶ 5, 23–35.[3]

---

[2] Despite recounting that the firearm was recovered from Defendant's waistband—that is, in his actual possession—the affidavit later asserts that this is "a firearm constructive possession case."  App'x, ¶¶ 10, 35.  That appears to be an error.

[3] The Court recognizes the obvious question here: if the firearm was recovered from Defendant's person, why search his phone for evidence of its possession?  Whatever the answer, the Fourth Amendment does not permit courts to deny an otherwise lawful warrant because the government already appears to have ample evidence of guilt.  *See United States v. Johnson*, No. 3:11-CR-139, 2012 WL 1998046, at *3 (N.D. Ind. June 4, 2012) ("A search warrant is not invalidated because law enforcement may already have sufficient evidence to prosecute a crime.").

On October 20, 2025, Defendant was released from custody pending trial subject to supervision by the Pretrial Services Administration. *See* ECF No. 7. Wanting his phone back, on October 22, Defendant moved under Rule 41(g) of the Federal Rules of Criminal Procedure for its return. ECF No. 10. That motion has been referred to the undersigned for decision. *See* Minute Order (June 29, 2026). To address both the warrant application and Defendant's Rule 41(g) motion, the Court ordered the parties to file supplemental briefing addressing whether the government's affidavit in support of the application established probable cause to search Defendant's phone. ECF No. 16. Given the importance of the legal issue, the Court also invited the Federal Public Defender for the District of Columbia to participate as *amicus curiae*, a role that the Federal Public Defender has ably discharged. To enable them to fully brief the issue of probable cause, and with the consent of the government, the relevant portions of the government's warrant affidavit were provided to Defendant and the Federal Public Defender. Following an extended briefing schedule, both the government's application for a warrant and Defendant's Rule 41(g) motion are now ripe for resolution.

## II.     LEGAL STANDARD

Federal Rule of Criminal Procedure 41(g) provides that "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." This "allows the owner of property the government has seized in a search to seek its return." *In re Sealed Case*, 716 F.3d 603, 605 (D.C. Cir. 2013). "[T]o prevail on a Rule 41(g) motion, the moving party 'must demonstrate that (1) he is entitled to lawful possession of the seized property; (2) the property is not contraband; and (3) either the seizure was illegal or the government's need for the property as evidence has ended.'" *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 311 (S.D.N.Y. 2018) (quoting *Ferreira v. United States*, 354 F. Supp. 2d 406, 409 (S.D.N.Y. 2018)); *see also Richman v. United States*, 350 F.R.D. 401, 411 (D.D.C. 2025). No one

contests that (1) Defendant is the rightful owner of the cellphone and (2) the cellphone is not contraband. *See generally* ECF Nos. 10, 32. The only dispute is whether the government's retention of Defendant's phone is permissible.

"When the government seizes property incident to a lawful arrest, the Fourth Amendment requires that any continued possession of the property must be reasonable." *Asinor v. District of Columbia*, 111 F.4th 1249, 1252 (D.C. Cir. 2024); *accord* Fed. R. Crim. P. 41 advisory committee's note to 1989 amendments. The government may "retain[]" property "lawfully seized" in an investigation "pending exhaustion of its utility in criminal prosecutions." *United States v. Hubbard*, 650 F.2d 293, 303 n.26 (D.C. Cir. 1980); *accord* Fed. R. Crim. P. 41 advisory committee's note to 1989 amendments. But "[t]he D.C. Circuit has instructed that 'the district court has both the jurisdiction and the duty' to ensure the return 'to the defendant of property seized from him in the investigation but which is not alleged to be stolen, contraband, or otherwise forfeitable, and which is not needed, or is no longer needed, as evidence.'" *United States v. Brown*, 185 F. Supp. 3d 79, 82 (D.D.C. 2016) (citation modified) (quoting *United States v. Wilson*, 540 F.2d 1100, 1101, 1103 (D.C. Cir. 1976)); *accord United States v. Price*, 914 F.2d 1507, 1510 (D.C. Cir. 1990) (per curiam). Accordingly, courts have recognized that the permissibility of the government's retention of property often turns on its "evidentiary value" in subsequent prosecutions. *Brown*, 185 F. Supp. 3d at 82; *compare United States v. Figueroa*, No. 22 Mag. 4490, 2022 WL 2873226, at *3 (S.D.N.Y. July 21, 2022) (denying Rule 41(g) motion for return of cellphones subject to search warrant), *with United States v. Cooper*, 798 F. Supp. 3d 1, 2–3 (D.D.C. 2025) (ordering return of phone under Rule 41(g) where "there [wa]s no reasonable argument that the phone presents any evidentiary value").

6

Here, all agree that Defendant's Rule 41(g) motion is intertwined with the government's application for a warrant to search his phone. *See generally* ECF Nos. 10, 25, 32. The government does not contend that the phone has any evidentiary value without access to its contents. Nor has the government asserted any other basis for the retention of Defendant's phone in the eight months since its seizure. *See generally* ECF No. 32. So the "evidentiary value," *Brown*, 185 F. Supp. 3d at 82, and "utility in [a] criminal prosecution[]," *Hubbard*, 650 F.3d at 303 n.26, of Defendant's phone depend on whether the government can search its contents. With few exceptions not relevant here, the government may search "data stored on cellphones" only after receiving a warrant based on probable cause. *Richman*, 350 F.R.D. at 417. Thus, if the government lacks probable cause for a warrant to search the contents of the phone, then the phone has no evidentiary value, and the Court will order its return under Rule 41(g). But if the government has probable cause for a warrant to search the contents of the phone, then the phone has potential evidentiary value in a criminal prosecution, and the Court will deny Defendant's motion. Accordingly, the question is whether the government has probable cause to receive a warrant to search Defendant's phone.

## III.    DISCUSSION

The popularity of smartphones has only grown since the Supreme Court observed in 2014 that they "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Riley v. California*, 573 U.S. 373, 385 (2014). And the wide-spread adoption of smartphones is not limited to innocent applications. "For centuries now, inventions heralded as advances in human progress have been exploited by the criminal mind." *Packingham v. North Carolina*, 582 U.S. 98, 106 (2017). As a result, most people—the law abiding and law breaking, alike—now "keep on their person a digital record of nearly *every* aspect of their lives." *Riley*, 573 U.S. at 395 (emphasis added). For that reason, the government often contends as one part of its search warrant affidavits that smartphones

owned by alleged law breakers often contain a digital record of the *criminal* aspects of their own-

ers' lives.  Here, distilled to its essence, that is the sole basis on which the government seeks to

search Defendant's phone.  Before diving into whether that contention alone satisfies probable

cause, it is worth understanding how Fourth Amendment doctrine has developed alongside the

growth of smartphones in our daily lives.

### A.        The Fourth Amendment and Smartphones

Ratified a century before Alexander Graham Bell patented the telephone and two centuries

before Steve Jobs announced the launch of the iPhone, the Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects,
> against unreasonable searches and seizures, shall not be violated, and no Warrants
> shall issue, but upon probable cause, supported by Oath or affirmation, and partic-
> ularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  While the telephone and iPhone would have seemed like science fiction

to the Fourth Amendment's Framers, the specter of "a too permeating police surveillance" was all

too real.  *United States v. Di Re*, 332 U.S. 581, 595 (1948).

"[T]he Fourth Amendment was the founding generation's response to the reviled 'general

warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage

through homes in an unrestrained search for evidence of criminal activity."  *Riley*, 573 U.S. at 403.

As was well-known to that generation, "the abuses associated with searches pursuant to general

warrants" in England "resulted in a series of cases" restricting their use.  Thomas K. Clancy, *The

Role of Individualized Suspicion in Assessing the Reasonableness of Searches and Seizures*, 25 U.

Mem. L. Rev. 484, 508–512 (1995) [hereinafter *Individualized Suspicion*].  General warrants

"specified only an offense—typically seditious libel—and left to the discretion of the executing

officials the decision as to which persons should be arrested and which places should be searched."

*Steagald v. United States*, 451 U.S. 204, 220 (1981).  As Chief Justice Pratt of the Court of

Common Pleas explained in the landmark case of *Wilkes v. Wood*, general warrants empowered agents of the Crown "to search wherever their suspicions may chance to fall" and were thus "totally subversive of the liberty of the subject." 98 Eng. Rep. 489, 498 (C.P. 1763).

In the new world, American colonists similarly decried "the use of suspicionless writs of assistance to enforce the customs laws." *Individualized Suspicion*, 25 U. Mem. L. Rev. at 502–508. Much like general warrants, "the writs of assistance used in the Colonies noted only the object of the search—any uncustomed goods—and thus left customs officials completely free to search any place where they believed such goods might be." *Steagald*, 451 U.S. at 220. Massachusetts attorney and patriot James Otis protested in 1761 that "officers may enter our houses[] when they please" under the auspices of writs of assistance "and whether they break through malice or revenge, no man, no court can inquire. Bare suspicion without oath is sufficient." Collected Political Writings of James Otis 13 (Richard Samuelson ed. 2015). Otis's words aroused such passion in the colonies that a "young John Adams" wrote after hearing Otis's speech that it "was 'the first scene of the first act of opposition to the arbitrary claims of Great Britain. There and then the child Independence was born.'" *Riley*, 573 U.S. at 403 (quoting 10 Works of John Adams 248 (Charles F. Adams ed. 1856)).

In response to the arbitrary searches enabled by general warrants and writs of assistance, the First Congress proposed what became the Fourth Amendment in 1789. *See id.*; *United States v. Ramsey*, 431 U.S. 606, 616 (1977). Moving at the speed of the mechanical printing press and horse-drawn carriage, ratification by the required eleven of thirteen states took more than two years. But in 1791, the Fourth Amendment (and the rest of the Bill of Rights) was ratified. *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 75 (1970). In some ways a product of its time, the Fourth Amendment expressly protects items familiar to the founding generation—

"persons, houses, papers, and effects." U.S. Const. amend. IV. As that history illustrates, however, the Fourth Amendment embodies a more "basic purpose," as relevant to the laptop and electric car as the printing press and horse-drawn carriage: "safeguard[ing] the privacy and security of individuals against arbitrary invasions by government officials." *Camara v. Mun. Ct.*, 387 U.S. 523, 528 (1967). The Fourth Amendment thus protects the "degree of privacy against government" intrusion so treasured by the founding generation even in spheres created by technology unimaginable to them. *Kyllo v. United States*, 533 U.S. 27, 34 (2001); *accord Chatrie v. United States*, __ U.S. __, __, 2026 WL 1855568, at *9 (2026).

Nowhere is that better illustrated than in the context of the smartphone. Today, everyone from Members of Congress to common criminals uses a smartphone for everything from "communicat[ing] with [other] Members and staff about legislation" to counting steps and clipping coupons. *In re Sealed Case*, 80 F.4th 355, 371 (D.C. Cir. 2023). As all smartphone users are (often acutely) aware, their phones contain "a digital record of nearly every aspect of their lives—from the mundane to the intimate." *Riley*, 573 U.S. at 395. A sophisticated smartphone user may consult ChatGPT before making an appointment with their internist, or bear their soul to Ash, the "AI designed for mental health," before seeking out a therapist. *See Ash*, https://www.talktoash.com/. And beyond the data knowingly created by the phone's user, smartphones enable the passive collection (often unknown even to the user) of "vast amounts of sensitive data." *TikTok Inc. v. Garland*, 604 U.S. 56, 72 (2025). As a result, the search of a smartphone "would typically expose to the government far *more* than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is." *Riley*, 573 U.S. at 396–97.

10

It should be no surprise, then, that smartphones are a tempting target for criminal investigators who see them as a veritable treasure trove of evidence. The Supreme Court has twice applied the Fourth Amendment to law enforcement's attempts to search them. In *Riley*, the Supreme Court confronted the warrantless search of a smartphone incident to the arrest of its owner. 573 U.S. at 386. Although a warrant usually is required for a search to be "reasonable" under the Fourth Amendment, the search-incident-to-arrest doctrine allows officers to search in the course of a lawful arrest the arrestee's person and any items found on them, such as a pack of cigarettes. *See United States v. Robinson*, 414 U.S. 218, 236 (1973). Relying on that doctrine, the police in *Riley* scrolled through the contents of Riley's smartphone, found on his person during his arrest, like here, for unlawful firearm possession. 573 U.S. at 378–79. Echoing the warrant affiant in this case, the government there argued that police "went through Riley's phone looking for evidence, because gang members will often video themselves with guns or take pictures of themselves with guns." *Id.* at 379 (citation modified). The government's defense of its warrantless search of the phone rested on a simple analogy to other things that may be found on an arrestee's person: A phone in an arrestee's right pocket is "materially indistinguishable" from a pack of cigarettes in his left. *See id.* at 393.

The Supreme Court unanimously rejected that "mechanical application" of the search-incident-to-arrest doctrine, *id.* at 386, likening the government's cigarette pack analogy to "saying a ride on horseback is materially indistinguishable from a flight to the moon," *id.* at 393; *see also id.* at 406 (Alito, J., concurring in part and concurring in the judgment) ("I agree that we should not mechanically apply the rule used in the predigital era to the search of a cell phone."). Instead, the Court examined the dual "rationales" of the search-incident-to-arrest doctrine—officer safety and preservation of evidence—and found that "neither . . . has much force with respect to digital

11

content on cell phones." *Id.* at 386. The Court explained that, unlike other things that may be found in an arrestee's pocket, the contents of a cellphone could not "be used as a weapon," and it would be the unusual case in which a warrantless cellphone search would prevent "more indirect" perils, such as by "alerting officers that confederates of the arrestee are headed to the scene." *Id.* at 387–88. Nor was there a need to search the contents of a cellphone already in the hands of police to prevent the destruction of evidence. *Id.* at 389.

On the other hand, cellphone searches "implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse." *Id.* at 393. As the Court emphasized, "[c]ell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person." *Id.* "Prior to the digital age, people did not typically carry a cache of sensitive personal information with them as they went about their day." *Id.* at 395. "Today," the Court observed, "it is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate." *Id.* Recalling Learned Hand's 1926 observation "that it is 'a totally different thing to search a man's pockets and use against him what they contain, from ransacking his house for everything which may incriminate him,'" the Court thus concluded that "[i]f his pockets contain a cell phone, that is no longer true." *Id.* at 396 (quoting *United States v. Kirschenblatt*, 16 F.2d 202, 203 (2d Cir. 1926)).

Accordingly, allowing the warrantless search of a cellphone incident to arrest would substantially decrease the degree of privacy guaranteed by the Fourth Amendment by exposing to the government in every case where a cellphone is found in an arrestee's pocket far more information than was possible in the predigital age. *Id.* at 396–97. But, as the Court explained, "[t]he fact that technology now allows an individual to carry such information in his hand does not make the

12

information any less worthy of the protection for which the Founders fought." *Id.* at 403. And although cellphone searches surely "can provide valuable incriminating information about dangerous criminals," the Court stressed that "the warrant requirement is 'an important working part of our machinery of government,' not merely 'an inconvenience to be somehow weighed against the claims of police efficiency.'" *Id.* at 401 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 481 (1971)). "Privacy," the Court concluded, "comes at a cost." *Id.* The Court thus held that "a warrant is generally required before" police may search the contents of a cellphone, "even when a cell phone is seized incident to arrest." *Id.*

Likewise, in *Carpenter v. United States*, the Court addressed whether a warrant is required to access cell-site location information ("CLSI")—information about which cell towers a cellphone has connected to and when, which can be used to map a phone's location—collected by wireless carriers for business purposes. 585 U.S. 296, 300 (2018). Generally, a warrant is not required to search business records held by a third party, such as a bank or phone company. *See Smith v. Maryland*, 442 U.S. 735, 742 (1979); *United States v. Miller*, 425 U.S. 435, 441-42 (1976). Nor is a warrant required to conduct limited technology-assisted tracking of a suspect's public movements, so long as the government avoids physically trespassing the suspect's property. *See United States v. Jones*, 565 U.S. 400, 408–11 (2012); *United States v. Knotts*, 460 U.S. 276, 281–82 (1983). In *Carpenter*, police used 127 days' worth of CSLI provided by Carpenter's wireless carrier without a warrant to connect his cellphone to the location of a number of armed robberies. 585 U.S. at 301–02. The government's defense of that search was again simple: Going through months' worth of Carpenter's CSLI was no different than tailing his car or flipping through files at his local bank. *See id.* at 313.

Again, the Court refused to "mechanically apply[]," *id.* at 314, doctrines developed when "few could have imagined a society in which a phone goes wherever its owner goes, conveying to the wireless carrier not just dialed digits, but a detailed and comprehensive record of the person's movements," *id.* at 309. "Prior to the digital age," the Court explained, "law enforcement might have pursued a suspect for a brief stretch" or trudged down to the phone company to thumb through its call logs. *Id.* at 310. But "[w]ith access to CSLI, the [g]overnment can now travel back in time to retrace a person's whereabouts" going back years, thereby gaining "an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" *Id.* at 311–12 (quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)). Nor could one realistically avoid generating CSLI—"cell phones and the services they provide are 'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern society." *Id.* at 315 (quoting *Riley*, 573 U.S. at 385). Accordingly, the Court held that government collection of CSLI is "a search," and therefore "the [g]overnment must generally obtain a warrant supported by probable cause before acquiring such records." *Id.* at 316.

### B.    Probable Cause

With a few exceptions not relevant here, the government must obtain a warrant before conducting a search, *see Veronica Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995), including, as *Riley* held, of "a cell phone seized incident to an arrest," 573 U.S. at 403. The government here seeks a warrant to search the contents Defendant's cellphone, seized in the course of his arrest, for evidence with which to prosecute him. This case thus raises a question not answered by *Riley* or *Carpenter*: What must the government show to justify the search of a smartphone? The Fourth Amendment provides the answer: "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."

By requiring probable cause, the Fourth Amendment "protects 'citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime.'" *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).  Rather than permitting officers, in the words of Chief Justice Pratt, "to search wherever their suspicions may chance to fall," *Wilkes*, 98 Eng. Rep. at 498, the Fourth Amendment imposes the burden on the government first to show that "there is a fair probability that contraband or evidence of a crime will be found in a particular place," *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  In that way, the Fourth Amendment reflects "the 'bedrock, axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law system'":  Every person is "presumptively innocent" until the government proves otherwise.  *Betterman v. Montana*, 578 U.S. 437, 442 (2016) (citation modified) (quoting *Reed v. Ross*, 468 U.S. 1, 4 (1984)).  And the government must prove it to a "neutral magistrate judge[]," providing an inter-branch "check on police discretion." *Missouri v. McNeely*, 569 U.S. 141, 155 (2013).

Because probable cause "turn[s] on the assessment of probabilities in particular factual contexts," the government's showing must be evaluated using an "all-things-considered approach" that accounts for "the totality of the circumstances."  *Florida v. Harris*, 568 U.S. 237, 244 (2013) (quoting *Gates*, 462 U.S. at 235).  Here, the government rests its probable cause showing on what it describes as "the ubiquitous presence of cell phones in everyday life for virtually everyone." ECF No. 32 at 3.  Because smartphones generally "contain a digital record of an individual's life," the government contends that a "suspect's device" is likely to "contain[] evidence relevant to [the suspected] offenses." *Id.* at 3–4.  In support of that contention, the government's warrant affidavit recounts that Defendant, a felon, was allegedly found in possession of a firearm and claims—much like the government did in *Riley*—that, given the "pervasiveness" of cellphones, and law

enforcement's general experience in other gun cases, individuals who unlawfully possess firearms often store on their phones "images or videos of what appears to be the specific subject firearm(s)," "communications regarding firearm possession and trafficking," and "records of financial transactions" in illegal firearms.  App'x, ¶¶ 5, 18–34.

Although the Court is unaware of any binding authority in this Circuit addressing a directly analogous warrant application, the principles governing probable cause are familiar and sufficient to resolve this case.  As explained more fully below, probable cause requires the government to establish (1) reason to believe that evidence will be found in the specific place the government seeks to search, and (2) a sufficient factual basis particularized to the circumstances of the individual case on which a neutral magistrate judge may make that determination.

*First*, the government must have "probable cause to believe that the legitimate object of a search is located in a particular place."  *Steagald*, 451 U.S. at 213.  "The Supreme Court has long distinguished between arrest warrants and search warrants" owing to the distinct interests they protect—bodily autonomy on one hand and "the privacy of [one's] home and possessions" on the other.  *United States v. Griffith*, 867 F.3d 1265, 1271 (D.C. Cir. 2017) (quoting *Steagald*, 451 U.S. at 213).  As a result, "[p]robable cause to believe that a person is engaged in criminal activity is not *carte blanche* to search all their personal effects."  *United States v. Orozco*, 41 F.4th 403, 409 (4th Cir. 2022).  To justify a search, the government also must show that "there is 'probable cause' to believe that contraband or evidence is located in a particular place."  *Gates*, 462 U.S. at 230.  "That means determining, to the requisite 'fair probability,' both that the place searched will have the materials sought and that those materials will contain evidence 'aiding' in a criminal's 'apprehension or conviction.'"  *Chatrie*, __ U.S. at __, 2026 WL 1855568, at *17  (citation modified) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 551, 552 n.7 (2012)).  In other words, the

16

government must "establish a sufficient nexus between the criminal activities alleged and the place to be searched." *United States v. Silva*, 146 F.4th 183, 189 (2d Cir. 2025) (citation modified) (quoting *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004)); *accord United States v. Holt*, 173 F.4th 1335, 1341 (10th Cir. 2026); *United States v. Wilson*, 153 F.4th 478, 485 (5th Cir. 2025); *Orozco*, 41 F.4th at 409.

*Second*, and relatedly, probable cause requires more than "a mere affirmation of suspicion and belief without any statement of adequate supporting facts." *Nathanson v. United States*, 290 U.S. 41, 46–47 (1933). As Justice Robert H. Jackson explained, although the Fourth Amendment does not "den[y] law enforcement the support of the usual inferences which reasonable men draw from evidence," it does require "that those inferences be drawn by a neutral and detached magistrate [judge] instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 13–14 (1948). Accordingly, the government may not rely on "affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the 'underlying circumstances' upon which that belief is based." *United States v. Ventresca*, 380 U.S. 102, 108–09 (1965) (quoting *Aguilar v. Texas*, 378 U.S. 108, 114 (1964)). "Sufficient information must be presented to the magistrate [judge] to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Gates*, 462 U.S. at 239.

That standard is neither onerous nor toothless. "In dealing with probable cause," "[t]he standard of proof is . . . correlative to what must be proved." *Brinegar*, 338 U.S. at 175. The facts and circumstances of the case must show a "fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. That "does not require direct evidence and may be based on a reasonable inference from the facts presented based on common sense and

experience." *Silva*, 146 F.4th at 189 (citation modified) (quoting *Singh*, 390 F.3d at 182); *accord Wilson*, 153 F.4th at 485; *Orozco*, 41 F.4th at 409. But "each affidavit must tether such an inference to the particular circumstances of the case." *Wilson*, 153 F.4th at 486. The "bar may be low, but it is not subterranean." *Id.* at 487.

The D.C. Circuit's opinion in *Griffith* demonstrates how these principles play out in practice, particularly as applied to cellphones. There, police had probable cause to believe that Griffith was involved in a deadly gang shooting a year prior. *Griffith*, 867 F.3d at 1268–69. In support of a warrant to search his apartment to locate and search his cellphone for evidence related to the shooting, an officer averred based on his "training and experience" that he knew "that gang/crew members" communicate about their criminal activities "through cell phones and other electronic communication devices and the internet"— much like the government did in *Riley* and again does here. *Id.* at 1269. Those representations, the D.C. Circuit held, failed to establish probable cause for a warrant to search Griffith's home for his phone.

For one, the government had no basis for its assumption that Griffith even owned a cellphone. The court acknowledged that "most people today own a cell phone." *Id.* at 1272. But, as the court explained, the government provided "no reason to think that Griffith, in particular, owned a cell phone." *Id.* The government offered "no observation of Griffith's using a cell phone, no information about anyone having received a cell phone call or text message from him, no record of officers recovering any cell phone in his possession at the time of his previous arrest (and confinement) on unrelated charges, and no indication otherwise of his ownership of a cell phone at any time." *Id.* Moreover, Griffith had just been released from prison, where he had no access to a cellphone. *Id.* at 1273. So the government had no factual basis from which to infer that *Griffith* owned a phone, and its assumption that he, like most people, owned one was insufficient. *See id.*

18

Nor did the court find that there was a reasonable basis to believe that a cellphone would be found in Griffith's apartment, even if he owned one. "People ordinarily carry their cell phones with them wherever they go," the court observed, rather than leaving them at home. *Id.* So the government's contention that it was likely to find Griffith's phone in a search of his apartment "rest[ed] on a second assumption: that [Griffith] (and his cell phone) would be home" at the time of the search. *Id.* As the Court explained, this "add[ed] another layer of inference onto an already questionable probable cause calculus." *Id.*

Finally, there was no reason to believe that evidence would be found on Griffith's cellphone, even if his phone was found in his apartment. Since "a cell phone, unlike drugs or other contraband, is not inherently illegal," the court explained that "there must be reason to believe that a phone may contain evidence of the crime." *Id.* at 1274. And without more, an officer's training and experience that "gang members" communicate about their crimes "through cell phones" did not cut it. *Id.* Although police may "fairly infer" that evidence will be found on a phone where the circumstances support that inference, such as where "multiple perpetrators may have coordinated the crime," that inference was not supported by the circumstances of Griffith's case. *Id.* To be sure, the underlying shooting involved multiple perpetrators, but "more than a year had elapsed since the shooting." *Id.* Finding probable cause thus required assuming that Griffith owned "the same phone more than one year later" and had not "delete[d] incriminating information by the time of the search." *Id.*

All told, "the warrant application provided virtually no reason to suspect that Griffith in fact owned a cell phone, let alone that any phone belonging to him and containing incriminating information would be found in the residence." *Id.* at 1270. And that was woefully insufficient, the court concluded, to justify "a full-scale search of his entire home based on the possibility that

19

he owned a phone and that a phone found there might be his." *Id.* at 1273. Indeed, the court found the warrant affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," precluding "good-faith reliance on the warrant" under *United States v. Leon*, 468 U.S. 897 (1984). *Griffith*, 867 F.3d at 1278 (quoting *Leon*, 468 U.S. at 923).

The court offered a final note, of particular relevance here. As the court observed, the government's argument boiled down to the proposition that, because most people now own a cellphone "and because a phone frequently contains all sorts of information about the owner's daily activities, a person's suspected involvement in a crime ordinarily justifies searching her home for any cell phones, regardless of whether there is any indication that she in fact owns one." *Id.* at 1275. The court could "[]not accept that proposition." *Id.* "Finding the existence of probable cause in this case," the court observed, "would verge on authorizing a search of a person's home almost anytime there is probable cause to suspect her of a crime." *Id.* "The general pervasiveness of cell phones," the court concluded, "affords an inadequate basis for eroding [the Fourth Amendment's] core protection" of the home. *Id.*

Viewing the government's warrant application here in light of those principles, problems arise almost immediately. The government contends based on the "training and experience" of the law enforcement affiant that three categories of evidence are likely to be on Defendant's phone: images or videos of Defendant displaying the firearm, communications regarding illegal firearms transactions, and financial records of illegal firearms sales. *See* App'x, ¶¶ 25–34. But as explained below, the government makes no argument that the conduct alleged in the warrant application—actual unlawful possession of a firearm by a felon—implicates the creation of digital evidence. Nor does the government provide any other information specific to the allegations in this case that

20

would otherwise provide a reasonable basis to believe that Defendant's phone contains evidence of his alleged crime.

To start, the government does not demonstrate that the act of unlawfully possessing a firearm by a felon necessarily implicates the creation of digital evidence. Certain categories of criminal conduct may do so, such that allegations concerning the underlying conduct on their own may support the inference that evidence is likely to be found on the suspect's phone. Examples include cybercrime cases in which digital devices like smartphones are a tool of the trade, *see, e.g.*, *United States v. Kvashuk*, 29 F.4th 1077, 1085–86 (9th Cir. 2022), or cases involving prohibited acts carried out using a digital device or prohibited digital content, *see, e.g.*, *United States v. Smith*, 108 F.4th 872, 879 (D.C. Cir. 2024) (finding probable cause where "suspected conduct included exchanging sexually abusive text messages and photos" with victim). That is not the case with respect to Defendant's charged conduct—the simple unlawful possession of a firearm—an analog crime committed in the real world. Nor is that a crime committed by multiple perpetrators where it could be reasonably inferred that one suspect's cellphone may contain evidence of coordination and communication with others. *See, e.g.*, *United States v. Bass*, 785 F.3d 1043, 1049 (6th Cir. 2015); *Silva*, 146 F.4th at 192; *see also Griffith*, 867 F.3d at 1274 (suggesting the same). And this is not a case where the suspect's location at a particular point in time—which data on, or emitting from, a cell phone may reflect—may be evidence of the crime charged. *See United States v. Sheckles*, 996 F.3d 330, 338–39 (6th Cir. 2021) (finding probable cause to track location of phone associated with suspected drug distributor during time of known drug deal). Again, the gun in this case was allegedly found on Defendant's person; the location of the crime—the place where he allegedly possessed the gun—is beside the point.

Nor does the government point to any other facts or circumstances, specific to Defendant's commission of the alleged crime, that would otherwise demonstrate that evidence of it would likely be found on his phone. Because of the variability of the facts of individual cases, it is not possible to list every way the government could develop the evidence in a given case to make that showing. But courts have permitted cellphone searches, for example, where the facts included "observ[ation of the suspect] using the phone" during the offense, *e.g.*, *Orozco*, 41 F.4th at 411, or where inculpatory communications from the suspect were in law enforcement's possession, *cf. United States v. Armstrong*, 60 F.4th 1151, 1162 (8th Cir. 2023) (finding wiretapping of cellphone justified based on messages from suspect to informant relating to drug deal). If the government has made any effort in this case to establish a nexus between Defendant's alleged crime and his cellphone (other than seeking a warrant to search it immediately following his arrest), it does not say. In any event, it proffers no facts that it has developed in its investigation similar to those which the Court has found sufficient to permit cellphone searches in the past, including, for example, photos or other electronic records of the defendant's possession of a gun, obtained, say, from social media accounts, an informant, or another location.

Offering none of that, the government is on shaky ground given the probable cause principles outlined above. Seeking to shore up its proffer, the government's affiant invokes the "training and experience" of law enforcement which she says shows that "in the significant majority of cases where law enforcement is able to access a suspect's device in the context of the investigation" of felon-in-possession cases, the "suspect's device contains evidence" relevant to that offense. App'x, ¶¶ 5, 24; *see also* ECF No. 32 at 3. To be crystal clear, *that is all the government offers here to show a nexus between Defendant's crime and his cellphone*: its training and experience that evidence is often found on suspects' phones in felon-in-possession cases. Based on that

training and experience alone, the government argues that it should be permitted to search Defendant's phone for similar evidence in this felon-in-possession case.

For the following reasons, the Court finds that showing insufficient to demonstrate probable cause to search Defendant's cellphone. In so doing, the Court does not question the veracity of the government's affiant or the sufficiency of her training and experience. But in determining probable cause, the Court must ultimately make "the usual inferences which reasonable men draw from evidence" and cannot blindly defer to law enforcement officers "engaged in the often competitive enterprise of ferreting out crime." *Johnson*, 330 U.S. at 13–14. The Court cannot do so here. Indeed, the government's insistence that its training and experience in similar cases alone is a sufficient basis to search Defendant's phone in this case creates more problems than it solves.

For starters, the D.C. Circuit has already rejected the sufficiency of such reasoning. In *Griffith*, "[t]he government's argument in support of probable cause to search [Griffith's] apartment rest[ed] on the prospect of finding one specific item there: a cell phone owned by Griffith." 867 F.3d at 1270. The court expressly noted that it did "not doubt that most people today own a cell phone" or that "that most criminals—like most people—have cell phones." *Griffith*, 867 F.3d at 1272, 1279. But the court explained that the government needed to provide "particularized information that [Griffith] owned one." *Id.* at 1273. And as the court observed, "the affidavit in this case conveyed no reason to think that Griffith, *in particular*, owned a cell phone." *Id.* at 1272 (emphasis added). It instead relied on generalities about "most people" and "most criminals." *Id.* at 1272, 1279. That was insufficient to show probable cause to search Griffith's home for a cellphone. *Id.* at 1273. The same is true here. Without more, the fact that a "significant majority" of felons who possess firearms allegedly store evidence of that fact on their phones does not justify searching Defendant's phone.

23

The government's reliance on law enforcement's "training and experience," ECF No. 32 at 4, to substantiate that fact does not change that analysis. Of course, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). But "training and experience, *without more*, is not a fact to be added to the quantum of evidence to determine if probable cause exists, but rather a 'lens' through which courts view the quantum of evidence observed at the scene." 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.2(c) (6th ed. 2020) (quoting *Pennsylvania v. Dunlap*, 947 A.2d 671, 674 (Pa. 2007)). That is especially so where (as here) law enforcement's training and experience, when distilled to its essence, appears to reflect mere common knowledge—that phones often store a lot of information about their owners, including about the crimes they may commit. As the Fifth Circuit recently explained, while the government may rely on inferences, "[t]he Constitution requires that those inferences be anchored in case-specific circumstances, not in generalized assumptions about what 'most people' might do." *Wilson*, 153 F.4th at 488 n.48. In part for that reason, the D.C. Circuit in *Griffith* rejected the government's attempt to establish probable cause to search for and seize a cellphone based only on the "affiant's experience" about how "gang members" communicate and "often . . . share intelligence about their activities through cellphones." 867 F.3d at 1275. And it did so despite agreeing that it did "not doubt . . . that many phones owned by criminals may contain evidence of recent criminal activity." *Id.* at 1279. But that was not enough: "Even so, officers seeking authority to search . . . must do more than set out their basis for suspecting [the defendant] of a crime." *Id.* Failing that, the magistrate judge should have refused to sign the warrant in *Griffith*. The Court will not make that same mistake here.

24

Beyond its rejection by the D.C. Circuit, the government's reasoning is also in substantial tension with the traditional principles governing probable cause. Sanctioning the government's reliance on generalizations about past cases alone would leave little left of the requirement that the government establish that "there is 'probable cause' to believe that contraband or evidence is located in a *particular* place." *Gates*, 462 U.S. at 238 (emphasis added). In the government's view, it need only point to law enforcement's experience that most individuals suspected of a particular crime harbor evidence of that fact on their cell phone. That experience would apply equally to every felon-in-possession case, meaning that if the Court were to accept the government's reasoning here, it would necessarily have to authorize the search of *every* felon-in-possession arrestee's phone. Accordingly, the government's position is fundamentally inconsistent with the principle that it must show "probable cause to believe that the legitimate object of a search is located in a *particular* place." *Steagald*, 451 U.S. at 213 (emphasis added).

So, too, would finding probable cause based only on the behavior of "most suspects" conflict with the rule that a magistrate judge may not rely on "affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the 'underlying circumstances' upon which that belief is based." *Ventresca*, 380 U.S. at 108–09 (quoting *Aguilar*, 378 U.S. at 114). Instead, so the government says, it need only invoke law enforcement's experience in most cases, untethered to any of the underlying facts and circumstances of this case. In effect, the government has thus repackaged an impermissible "mere affirmation of suspicion and belief without any statement of adequate supporting facts" as a generalization about most felons who possess firearms based on law enforcement's experience. *See Nathanson*, 290 U.S. at 46–47; *see also Gates*, 462 U.S. at 239. "But the Fourth Amendment demands more than generalities." *Wilson*, 153 F.4th at 486.

By the same token, adopting the government's reasoning would leave little role for the magistrate judge.  The requirement that a "neutral magistrate judge" find probable cause plays an "essential role as a check on police discretion" by requiring a coordinate branch of government to check officers' work.  *McNeely*, 569 U.S. at 155.  The Fourth Amendment thus imposes a "checkpoint between the [g]overnment and the citizen."  *Steagald*, 451 U.S. at 212.  But, again, that constraint exists only when the inferences supporting probable cause are "drawn by [the] neutral and detached magistrate [judge] instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."  *Johnson*, 330 U.S. at 14.  Otherwise, the granting of the search warrant becomes "a mere ratification of the bare conclusions of others."  *Gates*, 462 U.S. at 239.  By resting its application here entirely on generalizations drawn from the training and experience of law enforcement, the government essentially asks the Court to take its word for it— it provides no basis on which the Court could make an independent determination.  *See, e.g.*, ECF No. 32 at 9 ("[T]he affidavit makes clear *that agents believe* there is probable cause to believe that evidence of unlawful firearms trafficking will be found on the phone." (emphasis added)).  Adopting the government's approach thus "would effectively transform the police officer into a judge, and the court into a rubber stamp."  *Rivera v. Murphy*, 979 F.2d 259, 264 (1st Cir. 1992).[4]

---

[4] Even taking the government at its word, however, it is not clear that its warrant affidavit can bear the weight the government puts on it.  Thus far, the Court has proceeded by assuming (as the government seems to assume) that law enforcement knows based on training and experience that most felons who possess firearms have evidence of that fact on their phones.  But that is not actually what the government's warrant affidavit says.  The affidavit recounts that "in the significant majority of cases where law enforcement is able to access a suspect's device in the context of the investigation of [felon-in-possession cases], that suspect's device contains evidence relevant to the [felon-in-possession case]."  App'x, ¶ 24.  In other words, a "significant majority" of the *phones the government searches* have evidence on them.  That makes sense—the government has no way to know whether phones it does *not* search in felon-in-possession cases contain evidence.  But assuming that the government searches suspects' phones only after receiving a valid warrant (barring the rare case where an exception applies), the warrant affidavit here establishes the rather less impressive proposition that the government finds evidence in a "significant majority" of cases in which it has shown probable cause—a "fair probability that contraband or evidence of a crime will be found" on the phone, *Gates*, 462 U.S. at 238.  And given that the government has *not* otherwise demonstrated probable cause to search Defendant's phone, the government's experience with phones that it *has* probable cause to search says little about the probability of finding evidence on Defendant's phone.

Nor is the government's position compatible with the "totality-of-the-circumstances approach" that the Supreme Court has long required for probable cause. *Gates*, 462 U.S. at 230. As the Court has explained, probable cause is "not readily, or even usefully, reduced to a neat set of legal rules." *Pringle*, 540 U.S. at 371 (quoting *Gates*, 462 U.S. at 232). The Court has thus "rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach." *Harris*, 568 U.S. at 244. But the government proposes what is essentially a bright-line rule: It may establish probable cause in any felon-in-possession case (or indeed, as explained below, in *any* case) simply by cutting-and-pasting boilerplate language about the "pervasiveness" of smartphones, the vast amount of information they store, and the government's consequent experience recovering evidence from them in like cases in the past. *See* App'x, ¶¶ 18–22. The government's position would thus collapse the "all-things-considered approach" of the "totality-of-the-circumstances analysis" into a singular, predominating consideration: the ubiquity of smartphones in modern life. *See Harris*, 568 U.S. at 245. Elevating one consideration—particularly one as universally applicable as that—above all others "is the antithesis of a totality-of-the-circumstances analysis." *See id.*

What's more, interpreting probable cause as the government requests would blur the line between probable cause to arrest and probable cause to search. The government argues that, in its experience, most felons who possess firearms have evidence of that crime on their phones. ECF No. 32 at 3. The government lumps Defendant in with that group based only on his crime of arrest. In so doing, the government essentially contends that probable cause to believe that Defendant committed that crime on its own establishes probable cause to search his phone. Accepting that contention would thus create exactly the "*carte blanche* to search" all felon-in-possession arrestees' phones that the Fourth Amendment forbids. *See Orozco*, 41 F.4th at 409. But "probable

27

cause to arrest a person will not itself justify a warrant to search his property." *Griffith*, 867 F.3d at 1271. Thus, "officers seeking authority to search a person's home must do more than set out their basis for suspecting him of a crime." *Id.* at 1279. That is why *Griffith* rejected an argument that "would verge on authorizing a search of a person's home almost anytime there is probable cause to suspect her of a crime." *Id.* at 1275. And since "a cell phone search would typically expose to the government far *more* than the most exhaustive search of a house," any argument that would create near automatic probable cause to search a phone is even more suspect. *See Riley*, 573 U.S. at 396.

What precedent and traditional principles governing probable cause command, common sense confirms. Most fundamentally, the government's reasoning lacks any semblance of a limiting principle. Again, if the government's experience that most felons who possess firearms store evidence of that crime on their phones justifies the search of Defendant's phone, then that would justify the search of every felon-in-possession arrestee's phone. Nor does the government propose any way to prevent that reasoning from metastasizing beyond felon-in-possession cases. To the contrary, the government seems to embrace that result rather than run from it. The government repeatedly invokes the "ubiquitous presence of cell phones in everyday life for virtually everyone," ECF No. 32 at 3, noting that "virtually all adults and older teens in the United States use mobile digital devices," that "individuals use cellphones for all aspects of life," and that "cellphone[s] contain a digital record of an individual's life," App'x, ¶¶ 18–22. Given those facts, the Court is hard-pressed to see how accepting the government's argument would not provide probable cause for a warrant to search every arrestee's phone in every case, including even the most minor offenses. Graffiti artists probably frequently share photos of their handiwork via text, and youths caught with small amounts of marijuana no doubt often used their phones to purchase it. In the

28

government's eyes, its largess alone prevents it from seizing and receiving a warrant to search the cellphone of nearly any individual charged with a crime, no matter how trifling.

Such a hollow conception of probable cause cannot be squared with *Riley*. In *Riley*, the Court refused to allow the search of every arrestee's cellphone incident to arrest. 573 U.S. at 403. And the Court similarly rejected the government's fallback position "that the *Gant* standard be imported from the vehicle context." *Id.* at 398. *Gant*'s "less than probable cause" standard for searching an arrestee's car for evidence of the crime of arrest, *United States v. Vinton*, 594 F.3d 14, 25 (D.C. Cir. 2010), the Court explained, "would prove no practical limit at all when it comes to cell phone searches." *Riley*, 573 U.S. at 399. "It would be a particularly inexperienced or unimaginative law enforcement officer," the Court observed, "who could not come up with several reasons to suppose evidence of just about any crime could be found on a cell phone." *Id.* As a result, "applying the *Gant* standard to cell phones would in effect give 'police officers unbridled discretion to rummage at will among a person's private effects.'" *Id.* (quoting *Arizona v. Gant*, 556 U.S. 332, 345 (2009)). *Riley* thus required a warrant precisely to prevent government rummaging through every arrestee's phone in free-wheeling search for evidence. *See id.*.

The government's reading of probable cause here turns *Riley* on its head. By supplying what is essentially the makings for automatic probable cause to search the cellphone of nearly every arrestee, the government's argument would reduce *Riley* and the warrant requirement it imposed to a "mere paperwork requirement." ECF No. 26 at 6 (FPD's *amicus* brief). In the government's view, it need only repeat what it offers here—"cellphones are ubiquitous and regularly contain evidence of [insert offense]," App'x at 3 (capitalization omitted)—to receive a warrant to search an arrestee's phone. *See* ECF No. 32 at 3. In other words, to search every arrestee's phone in compliance with *Riley*, the government says, it need only file an affidavit invoking the very

facts on which *Riley* relied to reject a free-wheeling power to search every arrestee's phone. The undersigned thinks it unlikely that that was what the Supreme Court had in mind in *Riley*—a mere notional warrant requirement—when it mandated that the government "get a warrant" before searching a cellphone seized incident to arrest. 573 U.S. at 403. By its terms, *Riley*—and the Fourth Amendment—demand more than a literal "parchment barrier[] against the encroaching spirit of power," The Federalist No. 48, at 308 (James Madison) (Clinton Rossiter ed. 1961).

Beyond inverting *Riley*'s core holding, the government's approach would undermine *Riley*'s and *Carpenter*'s more fundamental protection of the "degree of privacy against government that existed when the Fourth Amendment was adopted." *Carpenter*, 585 U.S. at 305 (quoting *Kyllo*, 533 U.S. at 34); *see Riley*, 573 U.S. at 403. "Ever mindful of the Fourth Amendment and its history, the [Supreme] Court has viewed with disfavor practices that permit 'police officers unbridled discretion to rummage at will among a person's private effects.'" *Byrd v. United States*, 584 U.S. 395, 403 (2018) (quoting *Gant*, 556 U.S. at 345). *Riley* and *Carpenter* thus refused to apply the Fourth Amendment in a way that would expose to the government the privacies of one's life simply because they are now contained on all of our smartphones. *Riley*, 573 U.S. at 396–97; *Carpenter*, 585 U.S. at 311. As the Court stressed, "[t]he fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought." *Riley*, 573 U.S. at 403. But finding that the "pervasiveness" of smartphones provides probable cause, App'x, ¶ 22, would allow the government to search the phone of *every* person suspected of nearly any crime—or worse, the government could choose to impose that intrusion only on a disfavored few. Either way, that is exactly the unbridled discretion that, as *Riley* and *Carpenter* repeatedly emphasized, the Fourth Amendment is designed

to prohibit. And as the D.C. Circuit said of the home in *Griffith*, "[t]he general pervasiveness of cell phones affords an inadequate basis for eroding that core protection." 867 F.3d at 1275.

The scope of that potential intrusion is magnified by the immense amount of information stored on smartphones and how they are searched. As *Riley* explained, smartphones differ in both kind and degree from other personal property or records. Smartphones "collect[] in one place many distinct types of information . . . that reveal much more in combination that any isolated record." *Riley*, 573 U.S. at 394. And a smartphone's vast storage "capacity allows even just one type of information to convey far more than previously possible." *Id.* Thus, given the difficulty in "discern[ing] in advance what information will be found where," even a search pursuant to a narrowly drawn warrant could expose a staggering amount of innocent but deeply private information to the government. *See id.* at 399. And, of course, any information of an "incriminating character" the government comes across may be seized, even if it is outside the scope of the warrant, under "the 'plain-view' doctrine." *See Minnesota v. Dickerson*, 508 U.S. 366, 374–75 (1993) (quoting *Michigan v. Long*, 463 U.S. 1032, 1050 (1983)). That prospect alone could prove a powerful incentive for the government to push for the search of a smartphone wherever possible, both to find additional evidence of the suspected crime and to check for evidence of other crimes for which the government lacks probable cause to search.

For these reasons and others, many courts that have encountered similarly sweeping arguments for the searches of smartphones have rejected them out of hand. Most notably, another court in this Circuit recently rejected a similar warrant application for the search of a felon-in-possession arrestee's phone. *See In re Search of One Device and Two Individuals Under Rule 41*, 783 F. Supp. 3d 183, 188 (D.D.C. 2025). As Judge Faruqui there noted, "[l]acking facts and evidence specific to [the defendant's phone], the government falls back on 'boilerplate language' that 'provides few,

if any, particularized facts of an incriminating nature specific to the defendant's phone.'" *Id.* (citation modified) (quoting *United States v. Weaver*, 99 F.3d 1372, 1379 (6th Cir. 1996)).  Finding probable cause on that basis, he explained, "would verge on authorizing a search of a person's phone almost anytime there is probable cause to suspect her of a § 922(g) crime."  *Id.* at 189 (citation modified) (quoting *Griffith*, 867 F.3d at 1275).  Nor, he observed, could that essentially "*automatic* probable cause" be limited to felon-in-possession cases.  *Id.*

Driving home that point, almost twenty years ago, Judge Facciola rejected a warrant application not in a gun but a drug case in which "a police officer . . . represented that, in his experience, narcotic traffickers commonly use cell phones to communicate with each other, suppliers and customers."  *In re Search of Certain Cell Phones*, 541 F. Supp. 2d 1, 2 (D.D.C. 2008).  Finding probable cause on that basis, he explained, would require "conclud[ing] in every instance that the ownership of premises where drugs are found in itself justifies the search of the entire contents of the owner's cell phone, even though there is no indication that the owner ever used the phone in any way to facilitate drug trafficking."  *Id.*  Without more, he concluded, reason to suspect an individual selling drugs did not establish, "*ipso facto,* a reasonable likelihood that they have used their cell phones to sell drugs, thus justifying the search of its entire contents."  *Id.*

Echoing that point again more recently, in *United States v. LaCosta-Franco*, Judge Weilheimer concluded that "the ubiquity of cellphones does not, by itself, form the requisite nexus to search the device."  __ F. Supp. 3d. __, __, 2026 WL 906682, at *1 (E.D. Pa. 2026).  As she explained, "[t]he way in which these 'training and experience' or 'trust me' warrants divine a defendant's alleged cellphone use reveals nothing different than the way any free citizen uses a cellphone in the normal course."  *Id.* at *9.  "The logical extension of this view would" thus "permit the magic words 'training and experience' to justify the search of any phone for any crime

32

imaginable." *Id.* at *12. "But when it comes to establishing probable cause to sort through another's privacy," she concluded, "case-specific evidence must nudge training and experience across the finish line." *Id.* at *11.

And in *United States v. Banyan*, Judge Rakoff found that "blanket generalizations about the widespread use of cellphones are not sufficient to demonstrate probable cause." 791 F. Supp. 3d 388, 395 (S.D.N.Y. 2025) (quoting *United States v. Silva*, No. 23 Cr. 204, 2024 WL 3488305, at *8 (S.D.N.Y. July 19, 2024)). As to the officer's training and experience, he noted that "while it is certainly reassuring to learn that it was because of his professional training and experience that [the officer] learned that people commonly use phones to take selfies—what a discovery!—this insipid generalization is hardly sufficient to support rummaging at will through a cellphone's photographs." *Id.* at 396. Without "case-specific evidence establishing a nexus between the charged crime and [the defendant's] cellphone," there was no probable cause. *Id.* at 395.

Other district courts have reached the same conclusion. *See, e.g.*, *United States v. Opoku*, 556 F. Supp. 3d 633, 644 (S.D. Tex. 2021) (finding affidavit that did "not contain a single allegation regarding coordination of any of the offenses or the use of a cellphone" insufficient and observing that officer's "generalizations about the use of cellphones to coordinate, plan, and execute events apply no more so to 'gang members who commit violent crimes' than they do to every cellphone user in modern life"); *United States v. Tanzil*, No. 23-20654, 2025 WL 18642, at *3 (E.D. Mich. Jan. 2, 2025) (finding application "based on [officers'] training and experience about what they generally know to be true regarding people who unlawfully possess firearms" was "insufficient on its own" for warrant to search cellphone), *rev'd on other grounds*, No. 25-1102, 2025 WL 3244494, *3 (6th Cir. Nov. 20, 2025) (reversing based "on the good faith exception"); *United States v. Ramirez*, 180 F. Supp. 3d 491, 494 (W.D. Ky. 2016) (finding that "[w]ithout any additional detail

33

tying [the defendant's] arrest to his cell phone, this boilerplate statement [about criminals' cell-phone use] is insufficient to establish the particularized facts demonstrating a fair probability that evidence of a crime will be located on the phone").[5]

In a last-ditch effort to save its warrant application, the government claims that a line of D.C. Circuit cases finding probable cause to search the homes of suspected drug dealers should be extended to cover the smartphones of felons who possess firearms.  ECF No. 32 at 4–5.  As the D.C. Circuit explained in *United States v. Thomas*, the progenitor of this line of cases, "observations of illegal activity occurring away from the suspect's residence, can support a finding of probable cause to issue a search warrant for the residence, if there is a reasonable basis to infer from the nature of the illegal activity observed, that relevant evidence will be found in the residence." 989 F.2d 1252, 1255 (D.C. Cir. 1993) (per curiam).  *Thomas* thus found probable cause to search the home of an individual "observed engaging in narcotics trafficking" based on the "reasonable inference that [a] suspected drug dealer would keep evidence at home."  *Id.* at 1254–55.

---

[5] To be sure, the government marshals its own smattering of out of circuit cases it claims authorized cellphone searches based on similarly skeletal warrant applications.  ECF No. 32 at 6.  Some of the cases the government cites do no more than apply the good faith exception and thus offer little cover, *see United States v. Morton*, 46 F.4th 331, 335 (5th Cir. 2022) (en banc) ("We do not decide if the state judge should have authorized full searches of the phones based on these affidavits."); *United State v. Santos*, No. 24-2301, 2025 WL 2461770, at *3 (2d Cir. Aug. 27, 2025) (summary order) (similar), and many are entirely consistent with the analysis set out above, *see Silva*, 146 F.4th at 192 (finding the fact that the defendant "likely communicated with multiple other members of [a racketeering conspiracy] in the course of alleged conspiratorial conduct tends to support the inference that his cell phone contained evidence of that conduct"); *United States v. Lindsey*, 3 F.4th 32, 39–40 (1st Cir. 2021) (finding "evidence of active selling" of drugs, the defendant's possession of "*multiple* cellphones," and officer's experience that "using multiple cellphones is a common tactic used by drug dealers to conceal their drug business" sufficient); *United States v. Welch*, No. 24-cr-79, 2025 WL 1380063, at *4 (S.D.N.Y. May 13, 2025) (noting that warrant application "include[d] allegations that [the defendant] communicated with the victims through electronic means"); *United States v. Reed*, No. 22-20447, 2023 WL 6797001, *1 (E.D. Mich. Oct. 12, 2023) (approving affidavit that referenced public "postings from 2020 through 2022 on an Instagram account attributable to [the defendant], in which [he] was pictured posing with various suspected firearms, drugs, cash, and/or both").  With the remainder, the Court respectfully disagrees.  *See United States v. Geray*, 938 F.3d 1108 (9th Cir. 2019); *United States v. Samuels*, No. 24-cr-305, 2025 WL 723209 (S.D.N.Y. Mar. 6, 2025); *United States v. Hart*, No. 23-cr-293, 2024 WL 992632 (D. Minn. Jan. 3, 2024), *report & recommendation adopted*, 2024 WL 893335 (D. Minn. Mar. 1, 2024); *United States v. Jackson*, No. 18-cr-211, 2019 WL 13127190 (D. Minn. Jan 4, 2019), *report & recommendation adopted*, 2019 WL 13127184 (D. Minn. Feb. 26, 2019).

The D.C. Circuit fleshed out the reasoning behind that inference in later cases, rooting the inferential link between evidence of drug distribution and the home in either common sense or law enforcement's training and experience (or both).  In *United States v. Johnson*, the court relied on law enforcement's "expert testimony" that "drug dealers frequently keep business records, narcotics, proceeds from sales, and firearms in their houses."  437 F.3d 69, 72 (D.C. Cir. 2006) (quoting *Thomas*, 989 F.3d at 1254).  In *United States v. Spencer*, the court concluded that "no training is required to reach th[e] commonsense conclusion" that "the most convenient location to secure [drugs and other tools of the drug trade] is the home," noting that "drug dealers don't tend to work out of office buildings."  530 F.3d 1003, 1007 (D.C. Cir. 2008).  In *United States v. Cardoza*, the court likewise noted that law enforcement's "training and experience" on this front merely "echoes this Court's own analysis of the matter."  713 F.3d 656, 661 (D.C. Cir. 2013).  Finally, in *United States v. Washington*, the court found probable cause based on an affidavit that, "after describing [the officer's] extensive experience in drug enforcement, observed that drug traffickers . . . 'commonly retain much or most of their drug supply in their home or stash house.'"  775 F.3d 405, 409 (D.C. Cir. 2014).

*Thomas* and its progeny lend the government no support here.  To the contrary, they confirm the analysis set out above.  As *Thomas* explained, probable cause to search a home may be established based on "observations of illegal activity," "if there is a reasonable basis to infer from the nature of the activity observed, that relevant evidence will be found in the home."  989 F.3d at 1255.  In the context of drug dealing, that inference follows from the nature of the conduct.  The activity implies the existence of physical evidence—the "merchandise" itself, plus the concomitant "drug paraphernalia, weapons, written records, and cash."  *Spencer*, 530 F.3d at 1007.  And

35

"commonsense" and law enforcement's training and experience suggest that such physical evidence is likely to be stored "in the home." *Id.*; *see Washington*, 775 F.3d at 405.

The same is true of smartphones. In the context of smartphones, as explained above, certain illegal conduct may support the inference that digital evidence is likely to be found on a phone where such conduct is likely to create digital evidence (i.e., evidence likely to be found on a phone), such as conduct involving communication among multiple perpetrators, cybercrime, or the possession or distribution of prohibited digital content. *See Bass*, 785 F.3d at 1049; *Kvashuk*, 29 F.4th at 1085–86; *Smith*, 108 F.4th at 879. Just as a drug dealer is likely to store physical evidence in his home, a cybercriminal is likely to store digital evidence on his digital devices, including his phone. Thus, in such cases, as in drug dealing cases, the same underlying facts that support probable cause to believe a crime has occurred may often support probable cause to believe evidence will be found in a particular place.

But the same "reasonable inference" does not follow from "the nature of" illegal firearm possession. *Thomas*, 989 F.2d at 1254–55. As other courts have recognized, "it is far from clear that the same common sense that applies to drug dealers applies to those who unlawfully possess handguns." *Lane v. District of Columbia*, 211 F. Supp. 3d 150, 176 (D.D.C. 2016); *accord In re Search of One Device and Two Individuals under Rule 41*, 783 F. Supp. 3d at 192–193; *cf. Griffith*, 867 F.3d at 1273–74 (distinguishing *Thomas* because the "context [of searching for evidence of drug dealing] is markedly different" from searching for a phone). "While drug dealers usually require a place to store their inventory, gun owners can (and often do) carry their entire artillery—often a single pistol—with them at any one time." *United States v. Hopkins*, 128 F. Supp. 2d 1, 7 (D.D.C. 2000). And "it seems implausible that people illegally possessing handguns typically maintain" extrinsic evidence of that fact, such as "books, records, documentation and other papers

relating to the ordering, sales and servicing of their firearms." *Lane*, 211 F. Supp. 3d at 176. That is to say, the simple act of possessing a firearm does not imply the existence of digital evidence in the same way that a drug dealing operation implies the existence of physical evidence. To be sure, *some* felons who possess firearms no doubt happen to record evidence of that fact on their smartphones. But doing so is not a likely consequence of firearm possession in the same way that creating physical evidence is a likely consequence of drug dealing. And the government here offers no evidence that *Defendant* has done so, aside from his possession of a firearm. The mere fact of possession does not provide that "inferential link." *See Washington*, 775 F.3d at 409.

Resisting that conclusion, the government attempts to analogize firearm possession with drug dealing, contending that Defendant "had to acquire the gun from someone" and hypothesizing that "communications" or records relating to that sale will be found on his phone. ECF No. 32 at 9; *see also* App'x, ¶¶ 29–34. But the government presents no evidence that Defendant purchased the firearm using his phone, rather than, for instance, receiving it as a gift, paying for it with cash, or stealing it. And more fundamentally, this analogy exposes the illogic of the government's position. There is no allegation—much less, probable cause proving—that Defendant is a firearms *trafficker*; the government alleges that he may be the *purchaser* of, at most, a single firearm. In the drug dealing analogy, Defendant is the individual caught with a dime bag of marijuana. And the government cites no case extending *Thomas* to the homes (let alone the phones) of drug *purchasers* (let alone firearms purchasers). Instead, the D.C. Circuit has steadfastly required "probable cause to suspect a person of involvement in drug *trafficking*," *Griffith*, 867 F.3d at 1274 (emphasis added); *see Washington*, 775 F.3d at 409; *Cardoza*, 713 F.3d at 660–661; *Spencer*, 530 F.3d at 1007; *Johnson*, 437 F.3d at 71; *Thomas*, 989 F.2d at 1253–54, even going out of its way to note

that "[t]his is not a case where the suspect possessed only a user-level amount of marijuana," *Cardoza*, 713 F.3d at 660.

Nor would it make sense to extend *Thomas* to drug purchasers. Purchasing drugs seems far less likely to create substantial amounts of evidence aside from the purchased drugs themselves. So there would seem to be little reason to suppose that other evidence likely would be found in a drug purchaser's home. And even if the D.C. Circuit had applied that reasoning to *drug* purchasers, it would make even less sense to extend that reasoning further to *firearms* purchasers. Firearms, unlike drugs, are not consumable goods, meaning that Defendant could have purchased the firearm one day or ten years before his arrest. Without knowing when the alleged transaction took place, there is no way to conclude that there is a "likelihood that incriminating evidence continues to exist" on his phone. *Griffith*, 867 F.3d at 1275. Thus, even if Defendant purchased the firearm, it does not follow that evidence of that purchase is likely to be found on his phone.

All of that is to say, *Thomas* comes nowhere close to bridging the gap between the facts the government has alleged and the likelihood of finding evidence on Defendant's phone. Thus, the government has not "establish[ed] a 'fair probability that contraband or evidence of a crime will be found in a particular place'"—Defendant's phone—based on "'reasonable inferences' from the evidence described in the [warrant] application." *See United States v. Scott*, 150 F.4th 580, 593 (D.C. Cir. 2025) (quoting *Gates*, 462 U.S. at 240). Accordingly, the Court will deny the government's application for a warrant. And because the government asserts no other basis for its continued retention of Defendant's phone, the Court will grant Defendant's Rule 41(g) motion for the return of his property.

The Court will also order the government to return or destroy any copies of any digital material taken from Defendant's phone. Rule 41(g) contemplates that courts may order both "the

38

return" and "'the destruction of copies of records' in some circumstances." *Pinto-Thomaz*, 352 F. Supp. 3d at 312 (quoting *In re A Warrant for All Content & Other Info. Associated with the Email Account xxxxxx@Gmail.com Maintained at Premises Controlled by Google, Inc.*, 33 F. Supp. 3d 386, 398 (S.D.N.Y. 2014)); *accord* Fed. R. Crim. P. 41 advisory committee's notes to the 1989 amendments. In the context of digital files, the owners of such files retain a protectable "interest in them, including an interest in exercising the 'right to exclude' by deciding who could and could not access copies of them." *Richman*, 350 F.R.D. at 416 (quoting *In the Matter of Search of Twenty-Six (26) Digital Devices & Mobile Device Extractions That Are Currently in Possession L. Enf. In Washington, D.C.*, No. 21-sw-233, 2021 WL 5822583, at *13 (D.D.C. Nov. 30, 2021), *rev'd*, 2022 WL 998896 (D.D.C. Mar. 14, 2022), *abrogated by Asinor v. District of Columbia*, 111 F.4th 1249 (D.C. Cir. 2024)); *see also Hubbard*, 650 F.2d at 303. Because the government asserts no basis for the retention of any material copied from Defendant's phone, *see* ECF No. 32, the Court will order the government to return or destroy any such material. *See Richman*, 350 F.R.D. at 425 (ordering the government to return "all copies of the electronic files" created by the government).

*    *    *    *    *

The answer here lies in principles significantly older than the smartphone. Just over 250 years ago, Chief Justice Pratt rebuked general warrants as "totally subversive of the liberty of the subject" because they empowered the Crown's agents "to search wherever their suspicions may chance to fall." *Wilkes*, 98 Eng. Rep. at 498. James Otis likewise decried writs of assistance for allowing customs officers to "enter our houses[] when they please" based on nothing more than "[b]are suspicion." Collected Political Writings of James Otis, at 13. "[T]he Fourth Amendment was the founding generation's response" to those "unrestrained search[es] for evidence of criminal activity." *Riley*, 573 U.S. at 403. On the government's telling, though, it may digitally rummage

39

through the phone of any person it suspects of a crime, based only on the fact that smartphones now amass in one place all the information the Fourth Amendment was designed to protect. "Perhaps the construction of such a [digital] panopticon is wise. But [the Court] doubt[s] that the proud men who wrote the charter of our liberties would have been so eager to open their [phones] for royal inspection." *Maryland v. King*, 569 U.S. 435, 482 (2013) (Scalia, J., joined by Ginsburg, Sotomayor, and Kagan, JJ., dissenting).

### IV.   CONCLUSION

Accordingly, Defendant's Rule 41(g) motion, ECF No. 10, is **GRANTED**, and the government's application for a warrant to search the phone seized from Defendant is **DENIED**. It is further

**ORDERED** that the government shall immediately return to Defendant the phone seized in the course of Defendant's arrest and return or destroy any copies of any digital material currently in the possession of the United States taken from Defendant's phone. It is further

**ORDERED** that the government shall certify in writing to the Court that it has complied with this order within seven days of this order being issued.

**SO ORDERED.**

Date:  July 6, 2026

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

**APPENDIX: WARRANT AFFIDAVIT EXCERPT**

. . .

5.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violation of: 18 U.S.C. § 922(g)(1) Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year and 18 U.S.C. § 933 (Unlawful Trafficking of Firearms) (the "TARGET OFFENSES"), has been committed by RAYVON HARRIS and others. There is also probable cause to search the TARGET DEVICE, further described below and in Attachment A for the things described in Attachment B.

. . .

7.      On October 14, 2025, at approximately 9:25pm, Metropolitan Police Department (MPD) officers were on patrol in the 1000 block of 5th Street NW, Washington, D.C. The officers were in full uniform in a marked car. Officers observed a white motor vehicle parked in a "no parking zone" and they activated their marked police car's lights and sirens to conduct a traffic stop on the vehicle.

8.      [An officer] approached the driver's side window and asked the driver to lower the vehicle's windows. The driver momentarily rolled down the rear driver's side window, before rolling the window back up again. While the rear window was rolled down, [the officer] observed individuals inside the vehicle rummaging around, consistent with an attempt to conceal something. Officers then ordered all the individuals inside the vehicle to step out of the vehicle for officer safety.

9.      Rayvon HARRIS had been sitting in the rear seat of the driver's side in the vehicle. Officers conducted a plain view search of the vehicle and [an officer] observed a glass jar labeled "THC" in the pocket on the rear of the driver's seat, immediately in from of where HARRIS had

been sitting. Officers observed a yellowish-brown residue on the glass, consistent with THC was/hashish.

10.    Officers placed HARRIS under arrest for possession of a controlled substance, namely THC wax/hashish. During the search incident to arrest of HARRIS, Officers recovered a Glock, model: 23 Gen 5, 9mm pistol bearing serial number CBYF491 from HARRIS' front waistband. The firearm had an extended magazine loaded with 17 rounds of 9mm ammunition.

11.    HARRIS's identity was confirmed, and it was confirmed that HARRIS did not have a license to carry a firearm in the District of Columbia. A criminal history check showed that HARRIS was previously convicted:

- In 2019 in the District of Columbia case number 2019-CF2-001612 of: Carrying a Pistol Without a License – Outside Home/Business and sentenced to 24 months incarceration, execution of sentence suspended as to all, 3 year(s) supervised release suspended, Supervised Probation for 18 months.

12.    Accordingly, HARRIS would have been aware that he was previously convicted of a crime punishable by a term of imprisonment exceeding one year at the time he was in possession of the firearm and ammunition.

. . .

15.    I, and other special agents I work with, have experience investigating the statutes underpinning probable cause.

16.    To prove a violation of 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year), the Government must prove that:

a. the defendant possessed a firearm or ammunition;

2

b. the defendant did so knowingly and voluntarily; and

c. at the time the defendant possessed the firearm, he had been convicted of a crime punishable by more than a year imprisonment and were aware of that fact.

17.    The federal Firearms Trafficking statute, 18 U.S.C. § 933, criminalizes a broad array of conduct including shipping, transporting, transfer, causing to be transporting, otherwise disposing, or receiving any firearm if the transporter or receiver is aware that the possession or receipt of the firearm under those circumstances would constitute a felony. That statute also criminalizes any attempt or conspiracy to do the same. The Government must prove that the person doing such transferring or receiving knows or has reasonable cause to believe that the use, carrying, or possession of the subject firearm by the recipient would constitute a felony.

*Cellphones are Ubiquitous and Regularly Contain Evidence of the TARGET OFFENSES*

18.    It is also well-known that virtually all adults and older teens in the United States use mobile digital devices. In a fact sheet from November 13, 2024, the Pew Research Center for Internet & Technology estimated that 98% of Americans owned at least one cellular phone, and that nine in ten of these American cellphone owners own a smartphone. *See* Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited Oct. 16, 2025).

19.    Our courts have repeatedly recognized the ubiquity of cellphones. *See, e.g.*, *Riley v. California*, 573 U.S. 373, 395 (2014) (noting that as of 2014 "more than 90% of American adults own a cellphone). As the Supreme Court found, cell phones are "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Id.* at 385; *see also id.* at 395 ("According to one poll, nearly threequarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower.").

3

20.     This is consistent with my experience as a law enforcement officer. In almost all of the firearm investigations I have been involved in, when an individual is arrested, he or she is found to be in actual or constructive possession of at least one cellphone. Indeed, if law enforcement does not locate such a device, it is cause for concern and typically would result in additional effort to ensure that law enforcement has not missed a device in the search.

21.     Further, in my experience, individuals use cellphones for all aspects of life. Cellphones allow the basic communication functions of a telephone. But they also contain applications which allow users to engage in almost every daily task. This includes communicating; taking videos and pictures of important documents, objects, and moments; finding directions to help navigate; purchasing and/or paying for items; making and managing appointments for all manner of activities; banking; reserving local and foreign travel; renting vehicles or reserving shared rides; and dozens of other activities.

22.     Given their pervasiveness, as well as their use in these tasks, a cellphone contains a digital record of an individual's life. *See, e.g.*, *Riley*, 573 U.S. at 395 ("The sum of an individual's private life can be reconstructed" with a cellphone).

23.     Further, over the last three years, the Project Safe Neighborhoods (PSN) program has operated in most federal jurisdictions, with a focus to reduce violent crime. Here in Washington, D.C., that program has, among other things, focused on the arrest and prosecution of repeated firearm or violent offenders for firearms offenses, specifically including violations of 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year) and 18 U.S.C. § 933 (Firearm Trafficking). Over 200 federal firearms defendants have been prosecuted through the PSN program in Washington, D.C. over the last several years. Based on information provided to

4

me by other officers and agents, in almost all of these cases, where an individual is arrested on scene, they are arrested with a cellphone. Where an individual is subsequently arrested with an arrest warrant based on longer investigations, those individuals almost always have a cellphone on their person or nearby to their person (e.g., in their residence).

24.    Further, in the significant majority of cases where law enforcement is able to access a suspect's device in the context of the investigation of the TARGET OFFENSESS, that suspect's device contains evidence relevant to the TARGET OFFENSESS.[1] As set forth below, this includes photographs of an individual with the charged or other firearms; communications regarding the acquisition of the charged or other firearms, ammunition, firearms paraphernalia and accessories; searches and other activity reflecting attempts to the purchase of firearms, ammunition, firearms paraphernalia and accessories; as well as evidence connecting an individual to the location, container, or vehicle in which a firearm is recovered.

*Cellphones Contain Photographic and Video Evidence of Firearm Possession*

25.    I am aware from discussions with other law enforcement agents, as well as my own experience, of many cases in which a suspect is arrested in actual or constructive possession of a firearm(s) and that suspect's cellphone contains images or videos of what appears to be the specific subject firearm(s). I am aware of numerous cases of this variety where the recovered imagery is clear and detailed enough to match make, model and color. In other instances, the imagery is detailed enough so as to match up markings and scratches. I am further aware of many instances where law enforcement has obtained imagery which shows partial or entire serial numbers, which allow law enforcement to confirm the identity of the subject firearm(s). In all of these cases, some

---

[1] Law enforcement is not always able to obtain full cellphone extractions from cellphones. This can be caused by a variety of factors such as specific security features, the make and model of the cellphone, the operating system used by the cellphone, the condition in which the phone is recovered, and the speed with which law enforcement is able to obtain a search warrant.

of these cases include stand-alone imagery of firearms, but many of these cases include imagery of the defendant (or other subjects) actually holding or otherwise in possession of the firearms.

26. This type of evidence is compelling evidence of the TARGET OFFENSES. That is, an individual's possession of a firearm on other occasions tends to suggest that they possessed a firearm on the charged occasion. Further, it tends to suggest that their possession of a firearm was not accidental or by mistake, but knowing and voluntary.

27. This is particularly true because, in my experience and based on discussions with other law enforcement agents, law enforcement on many occasions is unable to obtain DNA or fingerprint evidence from firearms given their surfaces, how they are often passed from person to person, and limitations in the number of DNA profiles which can be compared, among other reasons.

28. In the absence of forensic evidence, images of an individual in possession of the charged firearm, of the charged firearm on its own, and even of other firearms is compelling evidence of the TARGET OFFENSES. As noted, I am aware that this type of evidence is regularly recovered from cellphones in cases such as this one.

*Cellphones Contain Communications Regarding Firearm Possession and Trafficking*

29. I am aware from discussions with other law enforcement agents, as well as my own experience, of many cases in which a suspect is arrested in actual or constructive possession of a firearm and that suspect's cellphone contains communications regarding firearm possession and trafficking.

30. Specifically, I am aware from my own experience in investigating firearm trafficking cases in non-PSN cases, and from information from other law enforcement officers and agents who have worked PSN cases involving firearms trafficking or the unlawful possession of

6

firearms by prohibited persons, that phones of federal firearms defendants often include texts, chats, and voice messages, in which a suspect communicates their interest in acquiring firearms, communicates regarding specific makes and models of firearms, negotiates for the purchase of firearms, discusses the need for the suspect to acquire firearms, and exchanges photographs or videos of firearms. These communications are sometimes through the cellphone's native messaging application and sometimes through the use of other communication and social media applications, such as WhatApp and Instagram.

31.    Individuals like the present subject are prohibited from purchasing firearms. Such individuals cannot legally purchase firearms at gun stores or gun shows. Instead, they must illegally purchase firearms from individuals selling those guns in an unlawful and, probably, unlicensed manner. Illegal gun dealers cannot rely on traditional advertising such as Google or Facebook advertisements, billboards, or radio or television advertisements for fear of investigation and arrest. Instead, in my experience, individuals illegally selling guns advertise on social media platforms such as Instagram, or more often, advertise or conduct sales by directly messaging the buyers via communications or social media applications. Often individuals selling firearms will direct message one or more firearms laying on flat surface such as a table or bed to display what is for sale.

32.    This type of evidence, which is commonly recovered from the cellphones of PSN suspects, is evidence of the TARGET OFFENSES.

*Cellphones Contain Financial Transactions Regarding Firearms*

33.    As noted above, individuals like the subject of this investigation, are legally prohibited from purchasing firearms. And the illegal sellers of firearms do not operate traditional businesses. This means that they typically do not accept credit or debit card payments. While some

7

of these sellers operate cash business, I am aware from my own experience and from discussions with other law enforcement agents, that individuals buying and selling illegal firearms often make and accept payments using cellphone peer-to-peer applications like CashApp, ApplePay, and Venmo.

34.     While records of financial transactions of the type that can be obtained via subpoena are the most common way to obtain evidence of payments regarding drug trafficking. I am aware that cellphones recovered from federal firearms defendants in some cases contain evidence of payments made to individuals suspected of firearm trafficking in amounts consistent with the amount an individual would pay for an illegal firearm. Further, the context surrounding a payment that can be recovered from a cellphone can more readily tie a specific payment to an unlawful firearm transaction than the record of the payment itself. For example, a text message thread in which a seller offers a buyer a firearm for a specified amount, and the buyer then says he has made a payment in that amount, more powerfully shows evidence of trafficking than the record of a payment from the buyer to the seller that would be found in financial documents (which almost certainly would not contain information explaining the payment's true, criminal purpose).

*Cellphones Contain Evidence Connecting a Suspect to the Recovery Location of Firearms*

35.     In my experience investigating federal firearms offenses, many times a firearm is not recovered from a suspect's person, but is recovered from a residence, vehicle, bag, or clothing associated with that suspect. The present case is similarly a firearm constructive possession case, and I have investigated many such constructive firearm possession cases. In those cases, law enforcement seeks to determine what, if any, connections exist between the location, conveyance, or container where the firearm was recovered (e.g., the residence, vehicle, or bag), and a suspect.

36.     I am aware that in these constructive possession cases, cellphones of federal

8

firearms defendants often contain evidence linking them to the location, conveyance, or container where a firearm was recovered. For example, I am aware that in some PSN cases that other agents have handled, photographs and communications from phones have linked subjects to vehicles. I am also aware of photographs linking PSN subjects to residences or bags in which firearms were recovered, and of suspects providing the residence addresses via communications applications which connects them with the place where the firearm is recovered. This type of evidence is commonly found on cellphones of PSN subjects.

37.    In sum, a search of the TARGET DEVICE would allow law enforcement to prove that the suspect, in fact, possessed the charged firearm and that his possession of the firearm was knowing and intentional. Further, it would allow law enforcement to investigate the receipt and transfer of this illegal firearm, which is itself a federal crime. Additionally, evidence from the TARGET DEVICE may yield ownership information of the TARGET DEVICE. All of the aforementioned information would further constitute evidence of the commission of the TARGET OFFENSES.

. . .